UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID R. PRESTA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05 C 179 |
| ) | |
| JO ANNE B. BARNHART, COMMISSIONER ) | Judge Nan R. Nolan |
| OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff David Presta claims that he is disabled due to a crushing knee injury. He filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act for the period after March 20, 2002. 42 U.S.C. §§ 416, 423(d). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons set forth here, the case is remanded to the ALJ for further evaluation.

## PROCEDURAL HISTORY

Presta applied for DIB on August 22, 2001, claiming that he became disabled on August 26, 2000 when both of his knees were crushed by a car at work. (R. 27, 57, 76.) The application was denied initially on November 6, 2001, and again on reconsideration on March 15, 2002. (R. 30, 35.) Presta appealed the decision and requested an administrative hearing, which was held on August 21, 2003. (R. 42, 271.) On October 31, 2003, the Administrative Law Judge ("ALJ") granted Presta's claim for benefits for the closed period between August 26, 2000 and March 20, 2002.[1] The ALJ found that Presta suffered a crushing injury to both knees that precluded him from

---

[1] On the last page of the decision, the ALJ inadvertently misstated the period as March 20, 2002 to March 20, 2002. The ALJ issued a supplemental opinion on December 13, 2003

performing a significant range of sedentary work during that period, and that his limitations at the "less than sedentary" level were of such severity that they significantly eroded the unskilled sedentary occupational base. (R. 24.) The ALJ also found, however, that Presta was not disabled after March 20, 2002 but was capable of performing a broad range of sedentary work. (R. 25.) On October 8, 2004, the Appeals Council denied Presta's request for review. (R. 7.) Presta now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Presta was born on December 20, 1975 and was 28 years old at the time the ALJ issued his decision. (R. 27.) Presta attended special education classes in a behavior program at Oak Forest High School in Oak Forest, Illinois from 1990 to 1995, and he received his GED in July 1996. (R. 82.) He is divorced and has two children, and he lives with his father, occupying an upstairs bedroom. (R. 306, 314.) Presta completed GM and Ford factory training sometime after receiving his GED and then began working as a mechanic. (R. 82, 85.)

### A. Medical History

#### 1. Presta's Injury

Presta was injured on August 26, 2000 when a car he was working on accelerated and pinned him against a brick wall at the knees. (R. 116, 173, 226.) A St. James Hospital emergency room physician noted that Presta had "probable internal derangement [of the left] knee," and instructed him to use crutches, to take Vicodin every eight hours for pain as needed, and to follow-up with his private physician. (R. 117.) On September 11, 2000, Presta's treating physician, Dr. Thomas P. Regan, found that Presta had "basically no motion" in his knees and "tenderness everywhere." (R. 133.) Dr. Regan recommended that Presta discontinue the Vicodin and begin

---

clarifying the proper period of disability. (R. 26, 343.)

taking Indocin SR for the pain and inflammation. He also referred Presta to the Oak Lawn MR & Imaging Center for an MRI. (R. 121, 133.)

On September 21, 2000, Presta underwent an MRI of his left knee, which showed a "contusion about the tibiofibular joint,[2] especially the fibular head," as well as a peripheral tear of the posterior horn medial meniscus.[3] (R. 121.) Presta returned to Dr. Regan one week later on September 27, 2000. After reviewing the MRI results, Dr. Regan decided to treat Presta conservatively, instructing him to stop taking the pain medication and to try bending his knee. (R. 133.) Between October 5 and 26, 2000, Dr. Regan reported that Presta was showing improvement with anti-inflammatory medication, but that he was "not being very cooperative as far as trying to do the things that I have suggested that he try and do" (such as physical therapy), and seemed primarily concerned with his pain medication. (R. 130.) Presta's knees were sore to the touch during that time, but they showed no instability or swelling. (*Id.*)

On October 24, 2000, Presta underwent an MRI of his right knee at Orland Open MRI. The attending radiologist, Dr. Barry D. Lessin, noted the following: small joint effusion; tear of the posterior horn of the medial meniscus which may extend into and involve the body of the medial meniscus; and a possible metallic artifact in the knee. (R. 120.) Two days later on October 26, 2000, Dr. Regan noted the possible meniscus pathology, as well as Presta's slow rehabilitation. (R. 130.) Over the next few weeks, Dr. Regan observed that Presta was slowly improving but still complaining about a lot of pain. Dr. Regan continued to try and treat Presta conservatively and to get him off the pain medication. (R. 128.) On December 7, 2000, Dr. Regan found that Presta was

---

[2] Ligaments and joints between the knee and leg. (http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=tibiofibular.)

[3] Cartilage in the back of the kneecap. (http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=meniscus.)

3

experiencing greater pain than before and noted that he could feel a little crepitation[4] with range of motion in Presta's left knee. Dr. Regan also indicated that Presta may need to have an arthroscopic examination. (*Id.*)

Presta began seeing a second treating physician, Dr. James Ingram, on December 19, 2000. (R. 173.) Dr. Ingram diagnosed bilateral posterior horn medial meniscal tears and probable post traumatic chondromalacia patella.[5] He recommended an arthroscopic intervention if Presta's discomfort did not improve with physical therapy. (R. 174.) Approximately one week later on December 28, 2000, Dr. Ingram re-examined Presta and found him to suffer from "retropatellar crepitus[6] greater on the right than on the left"; a positive patellar compression test; an equivocal McMurray medially in both knees[7]; a slight increase in effusion in the knees; and grade III signal in the posterior horn of the medial meniscus (i.e., meniscal tear). (R. 172.) Dr. Ingram noted that Presta was having "tremendous difficulty with stairs" and that his physical therapy occasionally aggravated his condition. Dr. Ingram prescribed Ultram and Feldene for the pain and inflammation. (*Id.*)

---

[4] "Crepitation" means crackling or popping. (http://www.thefreedictionary.com/crepitation.)

[5] Softening of the cartilage in the kneecap. (http://www.orthoseek.com/articles/chondromp.html.)

[6] "Crepitus" is a clinical symptom characterized by a crackling, crinkly, or grating feeling or sound in the joints. (http://arthritis.about.com/b/a/126558.htm.)

[7] The McMurray test is used to evaluate the presence of a mensicus injury. (http://meded.ucsd.edu/isp/2005/orthopedic/Exam%20Techniques/McMurray.htm.)

4

## 2. Presta's Knee Surgery

On February 16, 2001, Presta underwent a right knee arthroscopy with medial femoral condyle chondroplasty,[8] a resection of the medial parapatellar plica,[9] and a limited synovectomy.[10] (R. 217.) Approximately one month later, on March 15, 2001, Dr. Ingram's follow-up exam revealed no effusion or retropatellar crepitus in Presta's right knee, but continued retropatellar crepitus in his left knee. Presta indicated that he wanted surgery on that knee as well. (R. 169.) Presta saw Dr. Ingram again on April 5, 2001 and complained of persistent pain that became "excruciating" while performing lunges during physical therapy. Dr. Ingram recommended that Presta see Dr. Sherwin Ho for a second opinion, and noted that he may need an autologous contra-site transplantation (i.e., a tissue replacement from the non-operative knee). (R. 167.) Dr. Ingram also observed, however, that Presta continued to require increasing amounts of Vicodin, and that a portion of the pain was psychological. (*Id.*)

Dr. Ho examined Presta on April 25, 2001 and informed Dr. Ingram that most of Presta's pain appeared to emanate from his knee joints, which was consistent with the crush injury he sustained. (R. 228-29.) Presta complained of a burning pain, catching, and popping in his knees, stated that he had difficulty being on his feet for more than one hour. He also reported that he had stopped physical therapy due to the pain and was using a cane to walk. (R. 135.) Dr. Ho found that Presta's pain "seems to be out of proportion to his injuries as well as your [Dr. Ingram's] findings at the time of arthroscopy," and noted that Presta needed Vicodin ES every four to six hours, alternated with Ultram. (R. 136, 229.) Dr. Ho recommended corticosteroid injections in both

---

[8] "Chondroplasty" is reparative or plastic surgery of the cartilage. (http://medical-dictionary.thefreedictionary.com/chondroplasty.)

[9] "Plica" is "a thin wall of fibrous tissue that are extension of the synovial capsule of the knee." (http://www.athleticadvisor.com/Injuries/LE/Knee/plica_syndrome.htm.)

[10] "Synovectomy" is the surgical removal of the joint lining. (http://www.medterms.com/script/main/art.asp?articlekey=33988.)

knees, a return to physical therapy and, if necessary, referral to a pain control clinic. Dr. Ho concluded that if these measures failed, Presta would be a candidate for repeat arthroscopy, but not until at least six months following the operation. (R. 136, 229.)

On May 10, 2001, Dr. Ingram examined Presta and agreed with Dr. Ho's conclusion that his pain was out of proportion to the nature of his injuries and the surgical findings. Dr. Ingram found that Presta had full range of motion and no effusion, but continued crepitus in his left knee. He referred Presta for a triple-phase bone scan and recommended that he remain off work. (R. 166.) Presta had a bone scan on May 15, 2001, which revealed possible osteonecrosis or tendonitis; possible increased nuclide activity in the left fibular head; and an incidental increase in activity in the left tibial plateau. (R. 214-15.) On May 24, 2001, Dr. Ingram confirmed that Presta had increased uptake about the tibial tuberosity.[11] He also noted that Presta complained of intermittent burning symptoms behind the knee but could not elicit such pain during the examination. Dr. Ingram referred Presta for anesthesia pain control. (R. 165.)

Less than one week later on May 30, 2001, Presta went to the St. James emergency room complaining of right knee pain. Presta stated that the pain began on May 25, 2001, when he heard a popping sound in his right knee as he got out of bed. (R. 207.) On examination, the attending physician noted a small curvilinear metallic foreign body projecting in the soft tissues over the anterior medial aspect of the distal femur. (R. 212.) Presta returned to Dr. Ingram on May 31, 2001 complaining of a burning sensation in his knee, and grinding and popping of the knee cap. Dr. Ingram found pitting edema (swelling) in Presta's right foot; discomfort with palpation over the popliteal fossa; a bloatable patella; crepitus with attempt to flexion and extension; and beginning disuse atrophy of the right thigh, which "will profoundly negatively affect his patella femoral pain." (R. 163.) Dr. Ingram opined that Presta should not have the metallic foreign bodies removed from

---

[11] "Tuberosity" is "a protuberance on a bone especially for attachment of a muscle or ligament." (http://www.thefreedictionary.com/tuberosity.)

6

his knee because that would cause "future destruction and would be worse." Dr. Ingram continued to note that Presta's complaints of pain were out of proportion to his injury, however, and recommended no further surgical intervention until the pain decreased significantly. (R. 163-64.)

At a follow-up examination on July 12, 2001, Dr. Ingram noted minimal free fluid in Presta's right knee, but an audible click with flexion and extension that was more noticeable with "loading" activities such as squats. Dr. Ingram injected the right knee with a corticosteroid and instructed him to remain off work. (R. 162.) On August 2, 2001, Dr. Ingram reported that Presta had experienced no significant improvement in his condition since the right knee arthroscopy and continued to walk with a cane. Presta told the doctor that the corticosteroids rendered him pain free for three days, but then the symptoms gradually returned. On physical examination, Dr. Ingram observed persistent retropatellar crepitus and pain. He injected both of Presta's knees with corticosteroids and referred him to Dr. Ho for all subsequent care. (R. 160.)

Dr. Ho saw Presta on August 29, 2001 and found full range of motion in the right knee with no detectable effusion. Presta continued to complain of left knee pain, popping, catching, and swelling, and Dr. Ho recommended a diagnostic arthroscopy. (R. 225.) Shortly thereafter on September 6, 2001, Presta saw a third treating physician, Dr. Nicholas Angelopoulos, pursuant to a referral from Dr. Ingram. Dr. Angelopoulos initially diagnosed Presta with possible complex regional pain syndrome; treated him with a lumbar sympathetic block and a lumbar epidural sympathetic block; and sent him for physical therapy. Dr. Angelopoulos noted, however, that Presta "has been poorly compliant." Presta missed a couple appointments with the doctor and did not follow-up with his physical therapy. As a result, Dr. Angelopoulos declined to continue treating Presta. (R. 159.)

### 3. Presta's First Residual Functional Capacity Assessment

On October 15, 2001, Dr. Virgilio Pilapil, a non-treating State agency physician, completed a Physical Residual Functional Capacity Assessment ("PRFC") of Presta. Dr. Pilapil found Presta capable of sedentary work with restrictions to occasionally lifting 10 pounds; frequently lifting less than 10 pounds; standing and/or walking at least two hours in an eight-hour workday using an assistive device; sitting for six hours in an eight-hour workday; limited pushing and pulling with lower extremities; occasionally climbing stairs, balancing, stopping, kneeling, crouching, and crawling; and never climbing ladders, rope, or scaffolding. (R. 178-80, 185.)

### 4. Presta's Continued Medical Treatment

On February 2, 2002, Presta was admitted to the St. James emergency room after his knee gave out, causing him to fall to the floor. (R. 187.) Presta reported pain greater than 10 out of 10 and received pain medication. (R. 192.) Four days later, on February 6, 2002, Presta returned to Dr. Ho complaining of bilateral knee pain. Presta stated that he could barely get out of bed each day, but Dr. Ho continued to believe that the pain was out of proportion to the injury. (R. 224.) Dr. Ho found Presta to have full range of motion bilaterally with no effusion, stable ligaments, and no crepitation. He diagnosed continued chondromalacia, injected both knees with a corticosteroid, and referred Presta for more physical therapy. (*Id.*) When Dr. Ho saw Presta again on March 20, 2002, he found no change in his condition; Presta still had full range of motion in both knees, no detectable effusion or crepitation, and no signs of reflex sympathetic dystrophy ("RSD"). (R. 230.)

By August 26, 2002, Dr. Ho believed that Presta could occasionally lift 20 pounds; frequently lift 10 pounds; stand/walk less than two hours in an eight-hour workday; sit, push, and pull without limitation; and never climb, balance, kneel, crouch, crawl, or stoop. (R. 232-33.) On October 30, 2002, however, Presta returned to the St. James emergency room complaining that his right knee had "popped" after he got out of bed. (R. 237-38.) Presta reported pain at a level

of 9 out of 10, and the attending physician diagnosed exacerbation of his right knee chondromalacia and possible suprapatellar effusion. (R. 241.) One week later on November 6, 2002, Dr. Ho observed that Presta's condition had improved since the ER visit and that he "is now just using a cane for ambulation." Presta retained full range of motion with no detectable effusion or crepitation, and Dr. Ho instructed him to "simply increase his knee activity as tolerated" pending approval for another diagnostic arthroscopy. (R. 250.)

Progress notes from another treating physician, Dr. DeYoung, dated December 11, 2002 noted Presta's continued knee pain and resulting depression. The last medical note in the record, also from Dr. DeYoung, indicated that as of April 2, 2003, Presta suffered from continued knee pain, depression, fatigue, and mood swings. (R. 252-53.)

### B. Presta's Testimony

Presta testified that he is able to drive regularly for up to a half-hour; shop using a cane or shopping cart; and climb the stairs to and from his second floor bedroom with the use of his cane and the railing. (R. 314, 327.) Presta stated that he reads a lot, uses a computer for as long as two hours a day, and visits with friends and relatives. He also testified, however, that once or twice a week he is unable to sit at all and spends the day in bed, unable to concentrate. (R. 307, 315, 320, 328-29.) Presta ices both knees twice a day for approximately 20 to 30 minutes while laying on his back and elevating his legs, and if he fails to elevate his legs for a few hours his feet fall asleep and become numb and tingly. (R. 312-13, 325-26.)

In response to questions from the ALJ, Presta explained the reason that he stopped seeing Dr. Angelopoulos in September 2001. According to Presta, his examination with Dr. Angelopoulos was delayed, which made him miss his scheduled physical therapy. When Dr. Angelopoulos' office called Presta the next day to reschedule, he was home alone, under the influence of Vicodin, and did not feel comfortable driving. (R. 282-84.) Presta stated that he called Dr. Ingram, who told him

to stop seeing Dr. Angelopoulos and referred him for physical therapy under his supervision. (R. 284.) Presta attended physical therapy for two or three weeks, but then stopped due to pain. (R. 285.)

Presta testified that he feels pain in both of his knees and that his right knee burns on a regular basis, primarily behind the kneecap. He stated that the pain is "always there" and he is "always aware of it," even with medication. (R. 300-03.) Presta explained that he takes the anti-inflammatory medication Vioxx every day, supplemented with maximum strength Tylenol every other day for pain, and Vicodin once or twice a week for severe pain, caused by increased movement. (R. 303-04, 329-30.) Presta disagreed with Dr. Ho's November 6, 2002 assessment that he could sit for six hours in an eight-hour workday, stating that on a bad day he cannot sit at his computer at all. (R. 327-28.) Presta has trouble falling and staying asleep each night due to the pain, and claimed to wake up approximately one to four times a sleep cycle. (R. 313.) Presta testified that he suffers from depression due to the pain, but he did not pursue additional surgery because he could not afford it on his own and he was afraid of the quality of the free treatment offered at Oak Forest Hospital. (R. 322-23.) As Presta explained, "I seen a lot of bad things come out of that hospital, and I elected not to go there." (R. 323.)

### C. The Medical Expert's Findings

The Medical Expert ("ME"), orthopaedic surgeon Dr. Irwin Rich, testified that based on Presta's subjective complaints, he would be unable to sustain sedentary work on a regular basis. (R. 335-36.) The ME acknowledged the objective evidence showing that "if [Presta] could attend work on a regular basis, [he could] lift 20 pounds at table height and carry it a few steps occasionally, lift 10 pounds at table height frequently and carry a few steps, stand/walk at least two hours a day . . . [and s]it six hours in an eight-hour day." (R. 337.) The ME concluded, however,

10

that "[b]ased on the history that was obtained, I don't think he could sustain that on a regular basis." (*Id.*)

D. **Vocational Expert Findings**

The ALJ posed one hypothetical question to the Vocational Expert ("VE"); namely, "if pain is factored in to the limitations as set forth by either doctor – in Dr. Rich's opinion and/or the opinion of the treating doctor, Dr. Ho, who is an orthopedist, would there be the ability to sustain a workday . . . and/or attend to a schedule?" The VE responded "no" to both questions. (R. 338.)

E. **The ALJ's Findings**

The ALJ found that Presta suffers from the severe impairment of a crush injury to both legs, but that this does not meet or equal any of the impairments listed in Appendix 1, Subpart P, Part 404 of the Social Security Regulations. (R. 22.) The ALJ concluded that Presta was disabled from August 26, 2000 to March 20, 2002, but that he retained the residual functional capacity to perform a broad range of sedentary work as of March 21, 2002. (R. 24.) In reaching this conclusion, the ALJ determined that, even accounting for loss of worker's compensation coverage and fears of poor care quality at the free county treatment centers, Presta had chosen not to pursue additional surgical procedures directed to his improvement. (R. 23.) In the ALJ's view, "the[r]e is evidence the claimant has chosen to reject his treating sources opinions that he would benefit from further surgery, which could operate to allow him to return to his past relevant work." (R. 25.)

The ALJ noted Dr. Ho's opinion that Presta could only lift and carry 10 pounds frequently and 20 pounds occasionally; walk and stand less than two hours in an eight-hour workday; and never climb, balance, kneel, crouch, crawl, or stoop. Nevertheless, the ALJ concluded that "the[r]e is a likelihood for improvement through appropriate treatment in the period ending concurrent with his treating physician's recommendations." (R. 23.) The ALJ found Presta's claims of pain and depression "somewhat embellished," and determined that he could "stand for at least two hours

11

and walk, with his cane, distances up to one to two blocks out of an 8-hour day"; "sit six hours, with occasional elevation of his feet, at his option up to 6 inches"; "maintain a work schedule and remain on task with allowance for his allegations of pain"; and "concentrate and sustain concentration, persistence and pace within mild limitations." (*Id.*) Even with these additional limitations, the ALJ concluded, Presta was not disabled under the Social Security Medical-Vocational Guidelines ("grids"). (R. 24.)

The ALJ acknowledged the VE's testimony that no jobs existed for Presta, but found that this restriction applied only between August 2000 and March 20, 2002. As of March 21, 2002, the ALJ stated,

> a hypothetical and fully credible individual with the claimant's residual functional capacity for at least a broad range of sedentary work and the need to be absent up to two days per month due to his physical problems would still be able to find a significant number of jobs. He would be able to perform such positions as bench work, assembler, inspector, and hand packager.

(R. 23.) The ALJ found it significant that Presta is a younger individual (age 18-44), has a high school education, and has skilled work background "transferable to other positions." (R. 24.)

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Presta is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it

as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). (citation omitted).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

### B. Analysis

Presta argues that the ALJ erred in concluding that he is capable of performing a broad range of sedentary work as of March 21, 2002. He claims that (1) the ALJ's RFC is based on unsubstantiated evidence and an improper lay assessment of the medical record; (2) the ALJ made an incorrect credibility determination; and (3) the ALJ wrongly relied upon the Grids and played vocational expert. (Pl. Mem., at 12.)[12] The Commissioner insists that the ALJ's decision is supported by substantial evidence and must be upheld. (Def. Resp., at 6.)[13]

#### 1. The RFC

Presta argues that the ALJ made several unsubstantiated findings in assessing his RFC, including making a lay determination that Presta's condition would improve with additional surgery. The ALJ concluded that Presta could stand for at least two out of eight hours each workday; walk one or two blocks using a cane; sit for six out of eight hours each workday, with the option of

---

[12] Plaintiff's Memorandum in Support of Summary Judgment or Remand is cited as "Pl. Mem., at ___."

[13] Defendant's Response to Plaintiff's Motion for Summary Judgment or Remand is cited as "Def. Resp., at ___."

elevating his feet up to six inches; maintain a regular work schedule and remain on task despite his alleged pain; and sustain concentration, persistence, and pace with only mild limitations. (R. 23.) This is consistent with Dr. Ho's August 26, 2002 assessment, in which he stated that Presta could occasionally lift 20 pounds; frequently lift 10 pounds; stand/walk less than two hours in an eight-hour workday; sit, push, and pull without limitation; and never climb, balance, kneel, crouch, crawl, or stoop. (R. 232-33.)

Presta objects that the ALJ repeatedly asserted, without foundation, that his medical condition would improve with additional arthroscopic surgery. The court agrees that Presta chose not to pursue the surgery due to concerns about the quality of care at the free treatment centers, but nothing in the medical record establishes that such a procedure would have been successful. Nor was there any evidence regarding the type of work that would have been available to Presta upon completing the treatment. As of November 6, 2002, Dr. Ho believed that Presta should "simply increase his knee activity as tolerated" pending approval for another diagnostic arthroscopy. (R. 250.) Dr. Ho did not express an opinion regarding Presta's likely RFC after undergoing the arthroscopy. It is well-established that an ALJ cannot "play doctor" by making a medical conclusion without expert evidence. See *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")

That said, the ALJ's RFC is entirely consistent with the objective medical record. The Commissioner correctly notes that Presta's right knee improved following a February 2001 arthroscopy, and Dr. Ho did indicate that Presta would benefit from additional surgery. Dr. Ho also found no effusion or crepitation in Presta's knees, and full range of motion bilaterally as of November 2002. The ME testified, moreover, that based on the objective evidence, Presta could, even without surgery, "lift 20 pounds at table height and carry it a few steps occasionally, lift 10 pounds at table height frequently and carry a few steps, stand/walk at least two hours a day . . .

14

[and s]it six hours in an eight-hour day." (R. 337.) This conclusion is consistent with Dr. Ho's August 2002 findings that Presta could occasionally lift 20 pounds; frequently lift 10 pounds; stand/walk less than two hours in an eight-hour workday; and sit, push, and pull without limitation. (R. 232-33.) Thus, the real question is whether the ALJ properly assessed Presta's subjective complaints that he is nonetheless unable to work due to pain.

### 2. Presta's Credibility

Presta objects that the ALJ erred in finding him only partially credible with respect to his complaints of pain. (Pl. Mem., at 16.) Presta notes that under SSR 96-7p, an ALJ must first determine whether the complaints of pain are supported by objective medical evidence. See SSR 96-7p, at 2; *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). If not, the ALJ must consider other factors, including: (1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Presta objects that the ME and VE both concluded, after listening to his testimony, that he is unable to sustain employment. The ME opined, for example, that "[b]ased on the history that was obtained [from Presta], I don't think he could sustain [sedentary work] on a regular basis." (R. 337.) The VE similarly testified that Presta could not sustain a workday or attend to a schedule "if pain is factored in to the limitations as set forth by either doctor – in Dr. Rich's opinion and/or the opinion of the treating doctor, Dr. Ho, who is an orthopedist." (R. 338.) Presta claims that in rejecting his subjective complaints of pain, the ALJ erred in focusing on Presta's failure to obtain additional surgery. Presta explained at the hearing that he could not afford such a procedure, and

15

argues that the ALJ failed to consider this fact. In fact, the ALJ did note Presta's testimony on this point, but also stressed that Presta chose not to pursue treatment at a free treatment center. (R. 23.) Significantly, Presta did not state that he lacked access to the free clinic, or even that he attempted to obtain treatment there. *Cf.* SSR 96-7p (noting that an individual "may be unable to afford treatment and may not have access to free or low-cost medical services.") To the contrary, though Presta stated affirmatively that he wanted the surgery, he decided not to seek free treatment at all out of concern for the quality of care.

Presta also argues that the ALJ placed improper emphasis on his failure to follow the advice of Dr. Angelopoulos. Presta notes that he had a reasonable explanation for terminating his treatment with Dr. Angelopoulos; namely, (1) the doctor was running late for his appointment, which made Presta late for his physical therapy; (2) he was under the influence of Vicodin and unable to drive when the doctor's office called to reschedule the next day; and (3) Dr. Ingram instructed him not to return to Dr. Angelopoulos. (R. 282; Pl. Mem., at 18.) The ALJ did not discuss any of this testimony, but merely concluded that Presta was "poorly compliant[,] missed an appointment," and failed to follow up with physical therapy as suggested. (R. 22.)

Regardless, the record does support the ALJ's determination that Presta was not fully credible. First, the medical evidence does not support Presta's complaints. Both Dr. Ho and Dr. Ingram, Presta's treating physicians, repeatedly noted that, despite Presta's chondromalacia, his pain was out of proportion to his injury. The ALJ did not expressly mention this evidence, but reasonably found that Presta's allegations were embellished. (R. 23.) *See McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004) ("The ALJ need not address every single piece of evidence in his decision, . . . but his analysis must build an accurate and logical bridge between the evidence and his findings.") As the ALJ noted, moreover, by August 26, 2002, notwithstanding Presta's continued complaints of pain, Dr. Ho believed him to be capable of occasionally lifting 20 pounds; frequently lifting 10 pounds; standing/walking less than two hours in an eight-hour workday; sitting,

pushing, and pulling without limitation; and never climbing, balancing, kneeling, crouching, crawling, or stooping.[14] (R. 232-33.) In addition, the medical records showed that Presta had no detectable effusion or crepitation, and full range of motion throughout most of 2002. The ALJ properly considered these discrepancies between the objective medical evidence and the degree of pain articulated by Presta. See *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *Sutton v. Barnhart*, No. 05-2803, 2006 WL 1307959, at *5 (7th Cir. May 11, 2006) ("[A] discrepancy between an applicant's complaints and the medical record is . . . 'probative of exaggeration.'")

The ALJ also considered the effects of Presta's pain on his reported activities, noting that Presta is able to drive regularly for up to a half-hour; shop using a cane or shopping cart; climb up and down the stairs to his bedroom with the use of a cane and railing; socialize with friends and relatives; use a computer for as long as two hours a day; and read. (R. 314, 327.) Indeed, Presta acknowledged that he was capable of finishing a computer book he considered quite boring, and agreed that he could study and learn computers if he so chose. (R. 321-22.) As for Presta's depression, Dr. DeYoung noted in December 2002 and April 2003 that Presta's continued knee pain was resulting in depression, fatigue, and mood swings. (R. 252-53.) The ALJ concluded that the depression was not severe, however, noting Presta's testimony that he follows and has interest in current sports, world events, email communication, socializing, and reading. (R. 23, 320-22.) The ALJ also concluded that even assuming Presta experienced side effects from his medication (Vioxx daily, supplemented with maximum strength Tylenol every other day and Vicodin once or

---

[14] The court rejects Presta's assertion that the ALJ somehow relied on "a fictitious Dr. Hop's opinion." (Pl. Reply, at 3.) The ALJ noted the residual functional capacity assessment of "Dr. Sherwin Ho who opined Dr. Hop opined that the claimant was limited to lifting and carrying 10 pounds frequently, 20 pounds occasionally, walking and standing less than two hours in an 8-hour day with total restrictions against climbing, balancing, kneeling, crouching, crawling, and stooping." (R. 23.) The reference to "Dr. Hop" is clearly just a typographical error. The court also rejects Presta's erroneous claim that Dr. Ho found him capable of sitting for less than two hours. (Pl. Reply, at 3.) To the contrary, Dr. Ho found Presta capable of *standing/walking* for less than two hours, but sitting without limitation. (R. 232-33.)

17

twice a week), his daily living activities demonstrate an ability to concentrate and sustain concentration, persistence, and pace with only mild limitations. (R. 23.)

The ALJ further considered the frequency of Presta's pain. Presta testified that once or twice a week he is unable to sit at all and spends the day in bed, unable to concentrate. (R. 328-29.) The ALJ concluded that Presta would only need to be absent "up to two days per month due to his physical problems," apparently finding Presta's testimony only partially credible. (R. 23.) The ALJ also credited Presta's claim that he needs to periodically elevate his legs to prevent numbness and tingling. (R. 23 (allowing for "occasional elevation of [Presta's] feet, at his option up to 6 inches.").)

Presta finally objects that the ALJ wrongly emphasized his failure to obtain additional arthroscopic surgery in discounting his complaints of pain. (Pl. Mem., at 18.) The ALJ did indicate his belief that Presta's condition would improve with surgery, but he also found that "[n]otwithstanding the . . . claimant's allegations of continuing pain, the claimant could have had the opportunity for a broad range of sedentary function." (R. 23.) In light of the foregoing factors, the ALJ's assessment of Presta's complaints of disabling pain was not patently wrong. *Powers*, 207 F.3d at 435

### 3. The ALJ's Step Five Decision

Presta argues that the ALJ's decision must nonetheless be reversed because he improperly relied upon the Medical-Vocational Guidelines. At step five of the sequential analysis, the ALJ must determine whether a claimant who cannot perform his past work can perform any other work that exists in the national or regional economy. *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005). The ALJ may use the grids to make such a determination, but must recognize that the grids generally take account only of exertional limitations; i.e., impairments affecting a claimant's "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing and

18

pulling)." *Id.* (quoting 20 C.F.R. § 404.1569a(b)). Where a claimant has a non-exertional limitation (i.e., depression, anxiety, or difficulty concentrating or remembering) that might substantially reduce the range of work he can perform, the ALJ must consult a VE rather than relying on the grids. *Id.* (citing *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001)).

The ALJ found Presta incapable of performing his past work as a mechanic, but capable of performing at least a broad range of sedentary exertion pursuant to § 201.29 of the grids. (R. 24.) *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 2. Section 201.29 provides that a finding of not disabled is warranted where a claimant can perform only sedentary work and is a younger individual (age 18-44); with a high school education; and transferable skills. Presta claims that he "does not fit into the grids," and that the ALJ thus needed to consult with a VE, because he has the following additional nonexertional limitations: total restrictions on climbing, balancing, kneeling, crouching, crawling, and stooping. (Pl. Mem., at 21.) *See Haynes v. Barnhart*, 416 F.3d 621, 628 (7th Cir. 2005).

Given Presta's combination of exertional and nonexertional limitations, the ALJ was first required to determine whether Presta could be found disabled based on his strength limitations alone. *Haynes*, 416 F.3d at 629 (citing 20 C.F.R. Pt. 404, Subpt. P, App 2 § 200.00(e)(2)). The ALJ did not make such a determination here. Assuming that Presta is not disabled based solely on his exertional limitations, the ALJ was permitted to use the grids as a "framework," but otherwise needed to "reach a conclusion based on the factors and principles set forth in the regulations." *Id.* Where a claimant has a combination of exertional and nonexertional limitations, the regulations recommend consultation with a vocational expert. *Id.*; SSR 83-14.

The ALJ did consult a VE, but not with respect to the existence of jobs available to a person with Presta's specific limitations. In fact, the ALJ asked the VE only one hypothetical question: "[I]f pain is factored in to the limitations as set forth by either doctor – in Dr. Rich's opinion and/or the opinion of the treating doctor, Dr. Ho, who is an orthopedist, would there be the ability to sustain

19

a workday . . . and/or attend to a schedule?" The VE responded "no" to both questions. (R. 338.) The ALJ did not ask the VE about the types of jobs that would be available to an individual with Presta's limitations, but concluded without explanation that Presta could perform work as a bench work, assembler, inspector, and hand packager. (R. 23.) The Commissioner herself acknowledges that "[t]he ALJ did not purport to be relying upon vocational expert testimony as to the existence of specific jobs Plaintiff could perform." (Def. Resp., at 10.) The case must therefore be remanded to the ALJ for clarification as to whether Presta is disabled based on his exertional limitations alone and, if not, for consultation with a vocational expert regarding the jobs available to Presta in the national economy. *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) ("[T]his court has said that in cases where a non-exertional limitation might substantially reduce a range of work an individual can perform, the ALJ must consult a vocational expert.")

## CONCLUSION

For the reasons stated above, the case is remanded to the ALJ for further proceedings consistent with this opinion. On remand, the ALJ should determine whether Presta is disabled based on his exertional limitations alone. If not, the ALJ should consult a vocational expert to determine the number of jobs available to Presta in the national economy. Presta's motion for summary judgment or remand [Doc. 19] is granted in part and denied in part. The Commissioner's motion for summary judgment [Doc. 23] is denied.

ENTER:

Dated: September 21, 2006

NAN R. NOLAN
United States Magistrate Judge